UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Thelester Mahone,

     Plaintiff,

v.                                                                                    Civil Case No. 21-10370

State Farm Insurance Company, *et al.*,                      Sean F. Cox
                                                                                         United States District Court Judge
     Defendants.
_____/

**OPINION AND ORDER**
**DENYING IN PART AND GRANTING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an insurance contract dispute. Plaintiff, Thelester Mahone ("Mahone") sued

Defendants, State Farm Insurance Company and State Farm Fire and Casualty Company, for

breach of contract after they denied his claim under his homeowners insurance policy. The matter

currently before the Court is Defendants' Motion for Summary Judgment brought pursuant to FED.

R. CIV. P. 56. (ECF No. 30). The motion has been fully briefed, and a hearing was held on January

27, 2021.

For the reasons set forth below, the Court shall GRANT Defendants' motion to the extent

that State Farm Insurance Company is DISMISSED from this action and DENY the remainder of

Defendants' motion.

1

## BACKGROUND

Mahone commenced this action on November 20, 2020 in Wayne County Circuit Court. (ECF No. 1-1). On November 19, 2021, Defendants removed the action to this Court pursuant to 28 U.S.C. § 1332(a)(1). (ECF No. 1).

In the Complaint, Mahone brings a breach of contract claim alleging that Defendants "refus[ed] to abide by the terms of [his homeowner's insurance] policy by refusing to pay for the initial damages to the property" after water pipes burst in his home. (ECF No. 1-1).

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order and provide, consistent with FED. R. CIV. P. 56 (c) that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 3).

The parties complied with the Court's practice guidelines for summary judgment motions to the extent that Defendants filed a "Statement of Material Facts Not In Dispute" within their motion ("Def's Stmt") (ECF No. 17) and Mahone filed a "Counter-Statement of Disputed Facts" within his response ("Pl' s Stmt") (ECF No. 20).

This case involves a claim brought under Mahone's homeowners insurance policy with State Farm (the "Policy") following a reported February 11, 2019 water damage incident at Mahone's property.

According to the records from the City of Gross Pointe Woods (the "City"), there was no water used at the property during the period of November 3, 2018 through January 3, 2019. (ECF No. 17-11, at PageID 510). The City's records show a large amount of water usage at the property from January 3, 2019 through March 4, 2019. (ECF No. 17-12, at PageID 512). The water billing specialist from the City, Tina Hoenicke ("Hoenicke"), testified that from the City's records, she believed that the leak occurred on or about February 8, 2019. (ECF No. 17-13, at PageID 534). When she noticed the leak on February 8, 2019, Hoenicke called the number on file for the property and sent a letter to the property address informing Mahone that the City noticed an increase of water consumption, which may be associated with "a possible leak associated with this increase in consumption." (ECF No. 17-14, at PageID 553). The letter was returned to sender marked undeliverable. (ECF No. 17-14, at PageID 554).

On February 11, 2019, Officer Empson was called to check on the property because "water was flowing from the home, and [the City] couldn't find the outside water shutoff." (ECF No. 17-15, at PageID 557). The Officer Empson noted in his report:

> The windows of the home were iced over on the inside. There was ice protruding from areas of the home, and water was coming from the inside on the West side. I received no answer at the doors. I had dispatch contact the known phone number for the location with negative results. The front door was forced open due to flooding concerns. Upon entry there was a strong odor coming [from] same. There was also multiple bags of empty cans, and garbage throughout the home. There were so many empty cans that the path to the second floor and basement were blocked. The second door was forced open (East side) to gain entry to the basement so the [City] could shut of[f] the water. Once the water was shut off I reentered the home. It appeared to be vacant as there was not a piece of furniture or clothing to

3

> be found. The first floor damage consisted of collapsed ceilings, and buckling wood floors. The home was severely damaged throughout. The basement had several inches of standing water.

(ECF No. 17-15, at PageID 557-558). The Officer Empson also spoke with a neighbor to the property who stated that he hadn't seen the homeowner for approximately a month. (ECF No. 17-15, at PageID 558). In an email sent out to City employees warning them of the unsafe nature of the property, the City determined that "the water had been running for approx. 3 days somewhere upstairs. This caused the first floor ceiling to come down in at least 2 rooms. Also, the home is packed with approx. 100-150 bags of cans/bottles." (ECF No. 17-18, at PageID 615).

Mahone testified that on February 11, 2019, he was away from the property when he received a call from the City, which informed him that "something's wrong with the water, and that was it. And the water was running, and they shut the water off." (ECF No. 20-3, at PageID 866). When Mahone returned to the property, "[a] whole lot of water was in the home . . . Water in the basement. Water of the floors." (ECF No. 20-3, at PageID 868).

Mahone testified that he was at work when he received the phone call from the City (ECF No. 20-3, at PageID 866), but Defendants' claim file states that Mahone told the inspector that he was staying with a friend for a few days. (ECF No. 17-3, at PageID 370).

Mahone testified that he contacted a company to dry out the house, but "they came and they said that it needed to be - - the house need to be warmer. Like the heat, they couldn't do anything, because the water everywhere. They couldn't do anything." (ECF No. 17-4, at PageID 425).

Defendants temporarily closed the claim on February 28, 2019 because Mahone did not respond to Defendants' attempts to reach him. Defendants re-opened the claim after Mahone contacted them.

Defendants were able to inspect the property on April 16, 2019. (ECF No. 17-4, at PageID 369). In the report from Defendants' inspection, the inspector noted that the "property is separated into two separate units." (ECF No. 17-3, at PageID 369). The inspector confirmed Mahone's reports that the water had damaged the furnace. (ECF No. 17-3, at PageID 369). During the inspection, Mahone told the inspector that "SM came out and said they needed furnace to be working for heat in order to mitigate and run their machines." (ECF No. 17-3, at PageID 369). The report further notes:

> Insd never got plumber out to look at furnace. Advised insd that he needs to get furnaced fixed so mitigation can start. Advised insd that mold is not covered under the policy. Also asked isnd to have his plumber come out and look at the pipes to determine why pipes failed.

(ECF No. 17-3, at PageID 369). In a file note from May 20, 2019, it states:

> NI has not cooperated in getting utilities so ACH could determine if heat was maintained. ACH said there was no refrigerator or cooking utensils, he said it did not appear someone was living there. He said there was mold and no mitigation done. ACH has not been sent a plumbers report as requested.

(ECF No. 17-3, at PageID 368). In a file note from June 10, 2021, it states:

> Contractor gave options to repair and stated COL is from frozen pipes. However, with multiple breaks on locations [throughout] the home and the gas hot water tank being frozen indicates that the heat was not on or set below 55 [degrees]. CO would recommend multiple months and prior year gas bill to determine if the gas has been off for an extended period. It appears obvious the hot water tank was not in service since it froze.

(ECF No. 17-3, at PageID 367) (emphasis added). In a file note from June 24, 2021, it states:

5

> Placed call to insd at 313-427-5142, spoke with insd Thelester.  Insd stated that he has not gotten electrical fixed. Insd. stated that no mitigation has been completed at this point cause he doesn't have money for the electrical. Insd is going to send in his gas and electric bill for Jan and Feb.

(ECF No. 17-3, at PageID 366).

Upon Defendants' review of the utility records for the property, there was little gas usage at the property between January 16, 2019 and February 13, 2019 (ECF No. 17-7, at PageID 441). Valencia Turner-Williams ("Turner-Williams"), an executive consumer consultant from DTE Energy, testified that the amount of gas used by the property during the January 16, 2019 to February 13, 2019 period was low for the wintertime. (ECF No. 17-8, at PageID 459). Further, Turner-Williams stated that the gas usage for that period "appear[s] as if the furnace is not running[.]" (ECF No. 17-8, at PageID 460) (emphasis added). Additionally, that when compared to the previous year's bill from that same period, it "appear[s] that something is being done differently than the year before." (ECF No. 17-8, at PageID 463). She also indicated that the low amount of gas used could be because no one was living at the property:

> Q. Using these two bills and looking at the low usage for electricity and gas, does it appear to you like anyone was living in the home?
>
> A. It crossed my mind that there's a possibility that no one was living there.
>
> Q. You'd think that would be pretty tough to live in someplace that's not heated during winter, right?
>
> A. I agree. Correct.

(ECF No. 17-8, at PageID 466).

During Defendants' investigation, they contacted Hoover Electric and Plumbing. (ECF No. 17-3, at PageID 365). Hoover's estimates from the plumbing inspection that occurred in May 2019, provide that the estimate was for, "fixing water lines that have burst along with a water heater that

has frozen and cracked," and that there were "multiple breaks in the water lines all over the house." (Def's Stmt, at PageID 291). Defendants' file note described the phone call with a Hoover representative:

> [S]poke with Nathan Byers w/ Hoover electric & Plumbing, who stated that insured did have electric furnace, there was partial gas, but [mainly] electric, but came out to look at electric panels, he never did any repairs or diagnostics to furnace. Cntr stated first time tech was out @ residence was 2/20/ and then 4/28, and he never did any work in home to fix the electric. Plumber advised that the home was vacant, and city kicked insured out and plumber advised no way insured was living there, the building inspector had to come out and let both him and insured in with tech while he was out. This coincides with ACH notes that home appeared vacant upon [their inspection] in April. Cntr [advise no] work was ever completed at residence.

(ECF No. 17-3, at PageID 365). Hoover's general manager, Marcus Piwonski ("Piwonski") testified that freezing is the only reason for breaks in the pipes throughout the home. (ECF No. 17-9, at PageID 488). Piwonski testified that it was unusual for the water heater to freeze and crack because normally, if someone is living in the home, they would notice the other water lines breaking before the water heater would freeze and crack. (ECF No. 17-9, at PageID 488). Further, he testified:

> Q. And it would be very unlikely that anyone would be living there for that period of time because of how cold it would have to get; correct?
>
> A. Correct.

(ECF No. 17-9, at PageID 489). Piwonski concluded that the heat was not being maintained in Mahone's property based on the inspection. (ECF No. 17-9, at PageID 491).

On December 16, 2019, Defendants wrote Mahone a letter explaining why they were denying his claim:

> Based upon the results of prior discussions, site inspection, and further investigation of [Mahone's] claim, it was determined that heat was not reasonably maintained in [Mahone's dwelling] which caused the pipes to burst, resulting in

7

interior water damage. Furthermore, the resulting mold damage that occurred overtime by [Mahone] not mitigating [his] damages in a timely manner is unfortunately, not a covered loss under [his] policy.

(ECF No. 17-19, at PageID 617).

## STANDARD OF REVIEW

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

Further, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . ." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir.2008). "In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true . . . ." *Id.* (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). " 'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

8

one-sided that one party must prevail as a matter of law.' " *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005) ). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

## ANALYSIS

Because this Court sits in diversity, the substantive law of Michigan governs the claims of in this case. *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012).

"[C]onstruction and interpretation of an insurance contract is a question of law . . . ." *Henderson v. State Farm Fire and Casualty Co.*, 460 Mich. 348, 353 (1999). In this case, the Court interprets the language of the insurance policy and its terms in accordance with Michigan's well-established principles of contract construction. *Id*. "An insurance contract must be enforced in accordance with its terms. We will not hold an insurance company liable for a risk it did not assume." *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 111 (1999).

Michigan courts engage in a two-step process when determining coverage under an insurance policy: "(1) whether the general insuring agreements cover the loss and, if so, (2) whether an exclusion negates coverage." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 821 (6th Cir. 2018) (citing *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377 (1997).

Ambiguities in an insurance contract are construed in favor of the insured. *Masters*, 460 Mich. at 111. However, the court will not create an ambiguity where the terms of the contract are clear. *Id*. "The fact that a policy does not define a relevant term does not render the policy ambiguous." *Henderson*, 460 Mich. at 354. The Court "will interpret the terms of an insurance contract in accordance with their commonly used meaning." *Masters*, 460 Mich. at 111. (quotations removed). Whether contract language is ambiguous is a question of law. *Henderson*, 460 Mich. at 353. Where there is no ambiguity, the Court will enforce the terms of the contract as written. *Masters*, 460 Mich. at 111.

Here, the Policy includes homeowner's insurance. (ECF No. 17-2, at PageID 335). The Policy provides dwelling coverage for "direct physical loss to the property described in Coverage A, unless it is excluded or limited in SECTION I – LOSSES NOT INSURED or otherwise excluded or limited in this policy." (ECF No. 17, at PageID 296).  The Policy also provides personal property coverage for "direct physical loss to the property described in Coverage B caused by the following perils, unless the loss is excluded or limited in SECTION I- LOSSES NOT INSURED or otherwise excluded or limited in this policy." (ECF No. 17, at PageID 297).

Defendants argue that the Policy excludes coverage for several reasons. First, Defendants argue that the Policy's freezing exclusions preclude Mahone's claims due to his failure to maintain the heat at 55 degrees or more or to shut off the water supply and drain the appliances, as required by the express provisions of the policy. (ECF No. 17, at PageID 296). Second, Defendants argue that there is no coverage for the Mahone's claimed dwelling damages because the property was not his residence premises when the damage occurred. (ECF No. 17, at PageID 301). Third, Defendants argue that there is no coverage for any of Mahone's claimed damage because Mahone

violated the neglect exclusion within the Policy by failing to mitigate his damages. (ECF No. 17, at PageID 303). Fourth, Defendants argue that Mahone's personal property and ALE claims are barred by the Policy's one year period of limitations. (ECF No. 17, at PageID 304).

## I. The Freezing Exclusions

Regarding the dwelling coverage, the Policy states that:

SECTION I – LOSSES NOT INSURED

1. We will not pay for any loss to the property described in Coverage A that consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through m. below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
. . .

b. **freezing of a plumbing**, heating, air conditioning, or automatic fire protective sprinkler system or of a household appliance; or by discharge, leakage or overflow from within the system or appliance caused by freezing. This does not apply if you have used reasonable care to:

(1) maintain heat in the building structure at 55 degrees Fahrenheit or higher; or

(2) shut off the water supply and drain the system and appliances of water.

(ECF No. 17-2, at PageID 338) (emphasis added). Similarly, regarding the personal property coverage, the Policy states that, "freezing of a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or a household appliance" is a covered peril. (ECF No. 17-2, at PageID 337). However:

This peril does not include:

. . .

b. loss on the residence premises unless you have used reasonable care to:

(1) maintain heat in the building structure at 55 degrees Fahrenheit or higher; or

(2) shut off the water supply and drain the system and appliances of water.

(ECF No. 17-2, at PageID 337).

Therefore, under the language of the Policy, Defendants are obligated to cover the direct physical damage to the dwelling and personal property caused by freezing of a plumbing only if Mahone: (1) maintained heat in the building at 55 degrees Fahrenheit; or (2) shut off the water supply and drained the system and appliances of water.

Defendants argue that "there is no evidence that Plaintiff made any effort to maintain the heat at or above 55 degrees at the [property]." (ECF No. 17, at PageID 299). Indeed, there is a great deal of evidence that indicates that Mahone may not have been heating his property. Defendants point to the testimony of Piwonski in which he concluded that the heat was not being maintained in Mahone's property based on the inspection. (ECF No. 17-9, at PageID 491). Defendants also direct the Court do the testimony of Officer Empson who noted that ice was protruding from areas of the home, with the windows iced over from the inside. (ECF No. 17-15, at PageID 557-558). Finally, there is Turner-Williams' testimony that the gas usage at Mahone's property for the relevant period "appear[s] as if the furnace is not running[.]" (ECF No. 17-8, at PageID 460) (emphasis added).

However, Mahone has provided evidence that he has maintained the heat in his property: his own testimony.

Q. And did you maintain the heat in the home?

A. Yes, I did.

Q. And what did you maintain the heat to?

A. 69.

Q. And is that where you kept the thermostat at all times?

A. Yes.

Q. Did you ever take any pictures or anything to show that you kept the home at a certain temperature?

A. I kept it at the same temperature. No, I didn't have to take pictures.

Q. And was it the same temperature all year-round, or did you change it for - -

A. All year round.

Q. All right. So in January itself, you were maintaining the home at 69 degrees?

A. Yes. I kept it there. Okay. You know, yes.

Q. And even in the summer, you never changed it?

A. No, I kept the temperature like it was. Same. Same. Same temperature.

(ECF No. 20-3, at PageID 858-859). While this is the only evidence that Mahone has provided that he has maintained the heat, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . ." *CenTra, Inc.*, 538 F.3d at 412 (6th Cir. 2008). The Sixth Circuit has explicitly held that even where a plaintiff has presented no other evidence, the plaintiff's testimony is sufficient to defeat a defendant's motion for summary judgment. *Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015). "Whether his testimony is credible is a separate consideration that is inappropriate to resolve at the summary judgment stage." *Id*.

Therefore, "[d]espite the lack of corroborating evidence," Mahone's "testimony is sufficient to create a genuine issue of material fact" as to whether he maintained the heat in his property at or above 55 degrees Fahrenheit. *Id*.

## II. Residence Requirement

Regarding the dwelling coverage, the Policy states:

COVERAGE A – DWELLING

1. Dwelling. We cover the dwelling and materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration, or repair of the dwelling or other structures on the residence premises.

(ECF No. 17-2, at PageID 328) (emphasis added). The Policy defines "dwelling" and "residence premises" as:

DEFINITIONS

. . .

7. "dwelling" means the building structure on the residence premises **used as the primary private residence** and includes structures attached to the dwelling.

. . .

17. "residence premises" means:

      a. the one, two, there, or four family dwelling, other structures and grounds; or

      b. that part of any other building structure;

      **where you reside** and which is shown in the Declarations.

(ECF No. 17-2, at PageID 325, 327) (emphasis added). Therefore, under the terms of the Policy,

Mahone must have resided at the property for his loss to be covered.

Defendants argue that from

the lack of water and gas usage in the months leading up to the water damage incident (which were cold, winter months), it is clear that [Mahone's property] was not [Mahone's] residence premises at the time the damage occurred, precluding coverage under the policy. Similarly, the lack of clothing, appliances, ect., as found by Officer Empson, further confirm that [Mahone] was not residing at the property

14

(in addition to [Mahone's] admissions to State Farm that the property was for rental).

(ECF No. 17, PageID 302).  However, Mahone testified that he resided at the property.

Q. Well, I guess, did you live there continuously or did you live somewhere else in that 10-year period?

A. No sir. No, I lived there, sir. I fixed it up while I lived there.

Q. Okay. You never moved out to live with anyone else while you were fixing it up or anything like that?

A. No, I lived right there.

Q. Did you ever advertise the property for leasing?

A. No, I was still fixing it up.

Q. And when you were staying there, you were staying there every single night - -

A. Yes, sir.

Q. - - in the home?

A. Yes, sir.

. . .

Q. Yeah. Were you like sleeping there every night, and living there?

A. Yeah, I was living there.

(ECF No. 20-3, at PageID 857-858).

Just as with the freezing exclusion above, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . ." *CenTra, Inc.*, 538 F.3d at 412. Despite the lack of corroborating evidence, Mahone's testimony is sufficient to create a genuine issue of material fact as to whether he resided at the property at this stage in the litigation. "Whether his testimony is

credible is a separate consideration that is inappropriate to resolve at the summary judgment stage."

*Moran*, 788 F.3d at 205.

### III. Neglect Exclusion

In regards to the neglect exclusion, the Policy states under the Losses Not Insured section:

2. We will not pay for, under any part of this policy, any loss that would not have occurred in the absence of one or more of the following excluded events. We will not pay for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss.

. . .

d. Neglect, meaning neglect of the insured **to use all reasonable means to save and preserve property** at and after the time of loss or when property is endangered.

(ECF No. 17-2, at PageID 339-340) (emphasis added). Therefore, under the terms of the Policy, Mahone was required to use all reasonable means to save and preserve the property for his loss to be covered.

Defendants argue that

the evidence establishes that [Mahone] permitted the [property] to remain in a state of disrepair for months after the water damage, exacerbating the damages. Despite the policy requiring that he protect the property from further damage, he failed to do so, violating the policy's requirements.

(ECF No. 17, at PageID 303). Specifically, Defendants point to Hoenicke's testimony that she tried to contact Mahone via letter and telephone calls on Friday, February 8, 2019 regarding the leak. (ECF No. 17-3, at PageID 542). Then on the following Monday, February 11, 2019, she discovered that the leak was still ongoing, so she notified the City to go out to shut off the water. (ECF No. 17-3, at PageID 452). Defendants then direct the Court to Piwonski's testimony that anyone living in the house would have noticed the pipes bursting prior to the water heater cracking.

16

(ECF No. 17-9, at PageID 488). Defendants argue that if Mahone was living there, he could have and should have taken action sooner to prevent the further damage from occurring. (ECF No. 17, at PageID 303-304). Lastly, Defendants emphasize that Mahone "still has not taken any steps to remediate the water damages." (ECF No. 17, at PageID 304).

When Mahone was asked about his mitigation efforts at his deposition, the following transpired:

Q. And what did you do after you noticed?

A. A leak. And I basically was trying to figure out how to clean it - - clean it up.

Q. And what did you do to clean it up?

A. I just basically bought some - - basically bought some stuff to, you know, get the smell down, some stuff to clean out the mess in my house, and that was it.

Q. What did you buy?

A. Basically cleaning products. You could smell the house. It was smelling horrible.

Q. What did you do to like clean up the water?

A. I basically just - - basically - - I mean, the water was still there, so it was still there. I basically wanted to get the smell out the house with some air freshener or something. Yeah, to smell my house. The smell was bad.

Q. Did you ever get any mops and buckets, and try to get the water out?

A. Yeah, I bought some buckets and mops.

. . .

Q. Did you ever try to clean any of your clothes?

A. No, it - - I told you it smell horrible. Why would I clean my clothes? It smell horrible.

Q. Well, I didn't know if you ever took it to a dry cleaners or some - -

17

A. No, I'm not doing that. It smell horrible. Water every - - damage through - - water everywhere. Why would I take it to some cleaners, and you wash the clothes? That doesn't make no sense. There's water everywhere. I'm throwing it away.

Q. Did you throw all the personal property away already?

A. I threw my clothes away. I mean, I can't wear it. It smells horrible. And it would do all that stuff. I'm not wearing that.

Q. Did anyone inspect like the fridge, and stove, and microwave to see if it would still work?

A. I don't know, sir. I don't know.

Q. Do you know if any of those appliances still work?

A. I don't know, sir.

Q. Did you ever try them?

A. No, I don't know - - no, I didn't try. I don't know, sir. I was so mad and angry, I just - - I didn't - - you know, I didn't  - - you know, everything was damaged. Water. I just - - no.

Q. Okay. But I do want to just remind you under your policy, you have a duty to mitigate your loss, and to try to remediate some of these damages so that it didn't cause further loss. It is possible that by not trying or cleaning some of your products or appliances, that it became further damaged, that it could have been salvaged to begin with. So I just wanted to remind you that obviously that was a policy condition that you needed to do. And just so I am clear the only things you did to prevent further damages was mop, and bucket, and air fresheners to deal with the smell?

A. Yeah, It's water. I mean, well, water. Water everywhere. I mean, what could I do?

Q. Did you ever try to contact a company to dry out the house for you?

A. What are you talking about, sir?

Q. Like there's companies that will come out and dry out the whole house for you of water. Did you ever contact anybody for that?

A. I contact a company, but they came and they said that it needed to be - - the house need to be warmer. Like the heat, they couldn't do anything, because water everywhere. They couldn't do anything.

Q. And what company was that?

A. I forgot. I forgot it. But I forgot. I forgot what company it was, but they said they couldn't do anything right now.

Q. And I assume they told you that you needed the furnace working first?

A. They told me I need - - they told me that, and certain things I would need, and that was it. So I just said okay, and that was it.

Q. Dud you ever take further steps to help them try to dry out your home, like doing the things they suggested?

A. I mean, you know, I just do them. I said okay, I tried. Do that? Yes. I tried to do that, yes. I tried to do that, yes.

Q. And what did you try to do?

A. I tried to call about the - - get the estimates on how to repair the home back, and that was it. And the - - you know, that was it.

Q. And is there any reasons why you didn't follow through with any of that?

A. No, I followed through with it.

Q. Okay. But you said the home hasn't been repaired since; right?

A. Hasn't been repaired since.

(ECF No. 17-4, at PageID 423-426). According to Mahone's own testimony, he only mitigated his damages by buying some mops and buckets. Mahone also tried to get the home professionally dried out, but it was unsuccessful. Once the company visited the property, they told Mahone they could not do anything without a working furnace. After that, Mahone made no other attempts to ameliorate the several inches of standing water in the basement or address the collapsed ceilings, and water damaged walls and floors. Whether this is reasonable means to save and preserve his

property under the Policy is a genuine issue of material fact that cannot be resolved at this stage in the litigation. *CenTra, Inc.*, 538 F.3d at 412.

### IV. Mahone's Personal Property and ALE Claims

On August 23, 2021, at Mahone's deposition, he testified that he was claiming personal property and additional living expenses ("ALE"). (ECF No. 17-4, at PageID 419, 427). Prior to this, Mahone had not notified Defendants that he was seeking personal property and ALE coverage under the Policy. (ECF No. 17-4, at PageID 419, 427). On September 22, 2021, Mahone submitted documents in support of these claims. (ECF No. 17-20, at PageID 622).

Under the Conditions section, the Policy states that "any action by any party must be started within one year after the date of loss or damage. The time for commencing an action is tolled from the time you notify us of the loss until we formally deny liability." (ECF No. 17, at PageID 304).

Defendants argue that:

> because the claims for personal property and ALE were not presented until nearly two years after the date of loss, Plaintiff is not entitled to any tolling of the one-year period of limitation for those claims only. Accordingly, the claims for contents and ALE were not brought within one year of water loss and no coverage is available.
>
> . . .
>
> Therefore, Plaintiff's claims for ALE and personal property damages must also be dismissed pursuant to FED. R. CIV. P. 56(c).

(ECF No. 17, at PageID 304). Mahone argues that the personal property and ALE claims arise out of the same breach of contract that is at issue in this action. (ECF No. 20, at PageID 772).

There is only one cause of action at issue in this case: breach of contract. (ECF No. 1-1, at PageID 11). The contract at issue is the Policy. (ECF No. 1-1, at PageID 11). Mahone alleged that Defendants breached the Policy by denying him coverage for the losses he sustained after the pipes

burst in his home. (ECF No. 1-1, at PageID 10-11). Defendants' argue that the "claims for ALE and personal property damages must also be dismissed[,]" but Mahone has not brought separate claims for ALE and personal property damages before this Court. Instead, Mahone only alleged a broad breach of contract claim, and Defendants have not provided a basis for dismissing that breach of contract claim.

### V. State Farm Insurance Company

Mahone has named both State Farm Insurance Company and State Farm Fire and Casualty Company as defendants in this case. Defendants argue:

> [T]he parties to the contract/policy are Plaintiff and State Farm Fire and Casualty Company, as set forth in the Policy Declarations. (Exhibit A, Policy Declarations). There is no relationship between Plaintiff and State Farm Insurance Company, that could give rise to Plaintiff's claims in this lawsuit.

(ECF No. 17, at PageID 305).

In order for a plaintiff to recover on a breach of contract claim, privity of contract must exist between the parties. *Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 608 (E.D. Mich. 2017). "Privity of contract exists between contracting parties and intended beneficiaries." *Id*. Here, there is neither evidence that State Farm Insurance Company was in privity of contract with Mahone, nor that State Farm Insurance Company was an intended beneficiary to the contract. On the Policy's Renewal Declarations page, only State Farm Fire and Casualty Company is listed. (ECF No. 17-2, at PageID 311).

Mahone did not address this issue in his brief. During the hearing, Mahone's counsel conceded this issue and agreed that State Farm Insurance Company should be dismissed from this action.

Therefore, the Court DISMISSES State Farm Insurance Company from this action.

21

**CONCLUSION**

For the reasons explained above, the Court GRANTS Defendants' motion to the extent that State Farm Insurance Company is DISMISSED from this action and DENIES the remainder of Defendants' motion.

**IT IS SO ORDERED.**

Dated:  February 15, 2022                                    s/Sean F. Cox
                                                                      Sean F. Cox
                                                                      U. S. District Judge